## BLAKE *vs.* WHITE.

On an attempt by a creditor to impeach a conveyance of property, on the ground of fraud, evidence may be given of other sales of property, made by the grantor about the same time, to delay or defeat creditors, for the purpose of showing a fraudulent intent on the part of said grantor in making such conveyance. Such evidence will not, however, defeat a conveyance, unless it be farther shown that the grantee knew of such intended fraud, and the purchase was made by him in aid of such intent.

Declarations and acts of a person in possession of property may be given in evidence, as showing the character of his possession, and the grounds on which he claims to hold the same.

TRESPASS, for taking two French horses, property of the plaintiff, Oliver Blake, on the 10th of January, 1839, valued at $60 each.

Plea, the general issue, with a brief statement, alleging an attachment of the horses on a writ in favor of John Perley *vs.* James L. Blake, as the property of James L. Blake, and a subsequent sale of the horses on an execution recovered in the suit.

The plaintiff, in order to show the property of the horses in himself, proved that James L. Blake, who is a brother of the plaintiff, received one hundred dollars of the plaintiff, for the purpose of purchasing two horses: That he took a receipt from James for the money, and that afterwards James purchased the horses now in controversy, which were, in October, 1838, appraised to the plaintiff at $75, and that amount was endorsed on the plaintiff's receipt. The horses remained in the plaintiff's possession two or three weeks, and then went back into the possession of James L. Blake, as the plaintiff alleged to be kept for the winter, and remained in James L. Blake's possession until attached on the 10th of January, 1839, by the defendant.

The defendant contended that the horses were the property of James L. Blake, and that they were purchased in the name of Oliver Blake, and delivered to him for the purpose of a fraudulent cover of property, and to prevent their being attached for James' debts. It appeared that James failed some years prior to the purchase of the horses; that he was at that time indebted to a large amount, and that his indebtedness has continued to the present time.

To show James' indebtedness and fraudulent sales, or attempts at sales of property, about the time of the transfer of the horses to the plaintiff, the defendant introduced the testimony of one William Evans, that in the fall of 1838, after the ground was frozen, James applied to the witness to take a nominal conveyance of the horses, to prevent their attachment on the claim now in suit; which the witness declined doing. It also appeared, from the testimony of one Otis Grover, that James applied to him for the same purpose, about the middle of November, 1838, and that he declined such pretended sale; but, about two or three weeks afterwards, James applied to him again, and he made a nominal purchase of the horses with the money handed to him for that purpose, amounting to $75, for which he gave his note, which was afterwards given up to him. It did not appear that the

plaintiff was present or had any knowledge of these transactions. It was in evidence that the plaintiff declared that James was his agent in managing his farm and stock.

The defendant also introduced evidence tending to show that the plaintiff held, or claimed by declarations of his to hold and own the farm, property and stock thereon, on which said James lived, and on which the horses were kept until the attachment in the present suit, and that the claim was fraudulent, and a mere cover of property. To show this, the defendant offered evidence that James, in the year 1838, bargained for a small farm in Milan, of a Mr. Ingalls, at $250, and caused the deed of the same to be made out to the plaintiff; and assigned at the time, as a reason for so doing, that he wished to prevent the farm from being attached. Afterwards he exchanged this farm for one in Berlin, and purchased two tracts of land adjoining the same, and paid for one tract $50, and for the other $20, and took the deeds in the plaintiff's name. The defendant then shew subsequent declarations of the plaintiff, that he did not own a dollar in the farm property or stock where said James lived. He said it stood in his name, but that all the property he was the owner of was the farm and stock on the same, on which he himself lived, in Sweden.

The defendant offered evidence of James having a bond of land in Victory, which bond he sold or transferred to his father and the plaintiff, and which was subsequently sold at a very large advance, as the defendant contended for James' benefit. The said James was shown to have the principal agency in the business throughout, and was seen after this, in repeated instances, with large packages of bills in his possession. This evidence was offered as tending to show the means by which said James was enabled to purchase the farm, lands, stock, &c., aforesaid, and the horses now in controversy.

The plaintiff objected to the evidence of the fraudulent conveyance, and attempt to convey the horses aforesaid by

James, and the evidence of any declarations of James as to his object in taking a deed of the Milan farm in the plaintiff's name. Also, that the evidence as to the Victory lands was irrelevant, and incompetent to the issue on trial. But the testimony was received by the court.

Verdict was rendered for the defendant, and motion was made to set the same aside, on account of the admission of improper testimony.

*Wells*, for the plaintiff.

*Cooper*, for the defendant.

UPHAM, J. This was trespass, for taking two horses, alleged to be the property of the plaintiff. The defendant denied the ownership of the property in the plaintiff, and contended that the horses were the property of one James L. Blake, a brother of the plaintiff, as whose they were attached on mesne process, and sold on execution.

Evidence was offered that the horses were purchased by James L. Blake, with money furnished to him for that purpose by Oliver Blake, the plaintiff, and that the horses, after the purchase, were appraised to Oliver, in payment of the money advanced by him. It was contended, however, by the defendant, that this was merely a fraudulent arrangement for the cover of property, and that the purchase was in fact made with James L. Blake's means, and for his use.

Various circumstances were offered to show a fraudulent intent to cover property.

Except for a very short period, the horses were kept and used by James L. Blake as his. It also appeared that at the same time a large amount of other personal property was used and improved by James L. Blake for his own benefit, for which he rendered no account to any one ; which property was claimed by Oliver Blake, the plaintiff, and that the deeds of several tracts of land occupied by James were taken

in Oliver's name, while the consideration was paid by James. Oliver lived apart from his brother, in an adjoining town, with small means, as compared with his brother, in his immediate possession or control, and with little apparent ability to purchase or own such property.

Various declarations and acts of James, while in custody and charge of property in his possession, claimed as his brother's, were offered in evidence. Among other things, that at the time of the purchase of lands bought and paid for by James, the deed was taken in the name of Oliver, as James said, to prevent the attachment of the land by his creditors. It farther appeared that James, fearing the property might be attached on outstanding debts against him, applied to one or more of his neighbors to induce them to take a nominal conveyance of the horses now in controversy, notwithstanding the claim of his brother Oliver, and that he actually conveyed them for this purpose, by mortgage, for a fictitious debt.

It was in evidence that James had means, derived from the sale of certain lands in the town of Victory, to enable him to purchase and own the property shown to be in his possession; while at the same time he was deeply indebted in large sums, which he neglected and refused to pay.

The evidence offered to most of these points was objected to as incompetent.

It is rarely the case that fraudulent sales of property can be shown by direct testimony. Pretended transfers of property are always made with the forms of a real sale, and evidence is always ready to show a due execution of bills of sale, and a delivery of the property. This evidence it is necessary to rebut, and it can only be done by showing various circumstances, in the control and management of such property, and the situation and means of the parties; their previous dealings with and knowledge of each other; and, in certain cases, the dealings of the vender with others as to other property, at or about the same time, even without the knowledge of the vendee.

There must be a fraudulent intent shown as to both parties. If an individual, in failing circumstances, is shown to have disposed of large portions of his property by fraudulent sales, to defeat or delay creditors, this evidence tends to show a similar fraudulent intent on his part as to the disposition of any remainder of his property he may attempt to put out of his hands at or about the same time. This evidence does not affect the vendee, however. It merely shows a fraudulent intent on the part of the vender. It must be farther shown that the vendee knew and participated in this intent.

In *Foster* vs. *Hall*, 12 *Pick.* 89, evidence was offered of fraudulent conveyances of property by the grantor, at or about the same time with the conveyance to the demandant, without proof that the demandant knew of such intent in the grantor in making the conveyances. The evidence was rejected by the court on trial, but on revision the ruling of the court was held to be incorrect. Mr. Chief Justice Shaw, in delivering the opinion of the court, remarks, that " the proposition to be established by an attaching creditor, who seeks to vacate a prior conveyance on the ground of fraud, is, that the grantor made his conveyance with the intent, and for the purpose of defrauding his creditors, by a pretended and colorable sale, or by a sale without consideration, or upon a secret trust, contrary to good faith, and that the grantee knew of this intent, and participated in it. These propositions are in some measure independent of each other, inasmuch as there may be a fraudulent intent on the part of the grantor, but not known to the grantee, though proof of both must concur to make out a case for the creditor. But the evidence to prove these several propositions may be of different kinds and drawn from different sources. To prove the fraud of the grantor, his conduct and declarations before the conveyance may be the best evidence of his fraudulent purpose ; and if this is proved, the knowledge of it on the part of the grantee may be proved by any circumstances

tending to show a knowledge of the designs of the grantor. While, at the same time, without the latter evidence, the former would be wholly ineffectual to defeat the conveyance. The concurrence of a fraudulent design in both must be proved, to set aside the grant. See, also, 14 *Mass. R.* 245, *Bridge* vs. *Eggleston;* 5 *Shepley* 341, *Hawes* vs. *Dingley;* 3 *Fairf.* 515, *Howe* vs. *Reed;* 2 *N. H. Rep.* 223, *Lovell* vs. *Briggs;* 6 *Greenl.* 386, *Flagg* vs. *Withington.*

The doctrine of the case, *Foster* vs. *Hall,* was fully recognized and approved in *Whittier* vs. *Varney,* 10 *N. H. Rep.* 291.

On the authority of these cases, evidence was offered as to fraudulent sales and covers of other property, such as the purchase of land and the stock of the farm on which James L. Blake lived, which was made by James while the title was vested in Oliver. If these dealings betwixt James and Oliver were fraudulent as regarded James' creditors, it would tend to show that the purchase of other property, made and held by them in a similar manner, was made with the same fraudulent intent. The evidence that James had means from the sale of the Victory lands to buy the farm on which he lived, and the stock on the same, while Oliver had no apparent means for this purpose, would be clearly admissible to this point.

The mode in which the property was used by James, and his acts and declarations in relation to it, are admissible as showing the character of his possession, and whether he in fact claimed to hold the property in his own right or not. They also show an intention on his part of a fraudulent concealment of property from his creditors, as he mortgaged these same horses for a fictitious debt, to prevent an attachment of them as his property.

The entire business transactions betwixt James and Oliver, in relation to other property in evidence, was clearly competent, as showing a general design on their part to obstruct and delay the creditors of James. It was in evidence

Blake *v.* White.

that Oliver admitted that he did not own the stock on the farm, or the farm on which James lived. At the same time, James was deeply in debt, and the nominal title of the property was in Oliver. The intent to delay and defeat creditors was openly avowed on the part of James, in his general dealings, and the evidence tends to show that Oliver was cognizant of such intent throughout. At least, an array of circumstances was offered, strongly tending to implicate him in such fraudulent purpose. These circumstances were very properly submitted to the consideration of the jury, and their verdict upon them must be sustained.

*Judgment on the verdict.*

---

*Memorandum.* Mr. Justice UPHAM resigned his seat upon the bench, December 1st, 1842.

---

NOTE. The Revised Statutes, passed December 23, 1842, reduced the number of the associate justices of the superior court to two, and provided for the appointment of two circuit justices of the common pleas, having the same power to preside in the common pleas as the justices of the superior court.